**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 13, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

C. MARK CUPPS; MARK B.
KOENIG; CHERYL L. KOENIG;
DALE M. CARLSON; PEGGY
CARLSON; JOHN E. MCINROY;
ANN W. PECK; PHILLIP KOSKI;
ANDREA KOSKI; ESTHER
SANDOVAL; KAY YUEN HING
REVOCABLE TRUST; FLOYD A.
BARBOUR; WILLIAM G. CUTLER;
BRUCE R. SMITH; DEBRA J.
SMITH; JOSEPH RUPINKSKI, JR.;
LARRY WEYHRICH; KATHY
WEYHRICH; LARAMIE BOAT
CLUB, INC.; BARBARA J.
BARBOUR,

     Plaintiffs-Appellants,

v.

PIONEER CANAL-LAKE HATTIE
IRRIGATION DISTRICT,

     Defendant-Appellee.

No. 18-8024
(D.C. No. 2:16-CV-00086-SWS)
(D. Wyo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES, McKAY,** and **MORITZ**, Circuit Judges.

---

[*]     This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiffs-Appellants ("Landowners"), who own land adjacent to Wyoming's Lake Hattie Reservoir, seek review of findings of fact and conclusions of law in favor of Defendant-Appellee Pioneer Canal-Lake Hattie Irrigation District ("Irrigation District"), which owns and operates the reservoir.

According to the Landowners, the Irrigation District allowed reservoir water to encroach on their land, impermissibly exceeding the boundaries of a right-of-way approved under the Act of March 3, 1891, 26 Stat. 1095, 1101–02 (1891) ("Act").[1]  Following a bench trial, however, the district court ruled against the Landowners, finding that the Irrigation District had not exceeded its right-of-way.

For reasons set forth below, we agree with the Landowners that the district court's reasoning was erroneous and conclude that the judgment cannot otherwise be upheld.  Exercising jurisdiction under 28 U.S.C. § 1291, we **reverse** and **remand** for additional proceedings consistent with this opinion.

**I**

---

[1]     The Act was repealed in 1976, but the law repealing the Act contained a savings clause providing that existing rights-of-way remain effective. *See* Federal Land Policy and Management Act of 1976, 90 Stat. 2743, 2786 (Oct. 21, 1976) (stating that nothing in the new law "shall be construed as terminating any valid . . . right-of-way[] or other land use right or authorization existing on the date of approval of this [a]ct"); *id.* at 2781 ("Nothing in this title shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted.").

**A**

As relevant here, the Act permitted canal and ditch companies to obtain rights-of-way through certain public lands "to the extent of the ground occupied by the water of [a] reservoir and of [a] canal and its laterals, and fifty feet on each side of the marginal limits thereof." 26 Stat. at 1101. The Act continued:

> *Provided*, That no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation, and *all maps of location shall be subject to the approval of the Department of the Government having jurisdiction of such reservation*, and the privilege herein granted shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective States or Territories.

*Id.* at 1101–02 (second emphasis added).

To "secure the benefits of" the Act, a company had to "file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior [("Secretary")] the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way." *Id.* at 1102. The Act applied to "all canals, ditches, or reservoirs, heretofore or hereafter constructed, . . . on the filing of the certificates and maps herein provided for." *Id.*

In 1908, the Department of the Interior ("Department") adopted regulations for obtaining a right-of-way under the Act. *See* Regulations for Rights of Way

3

over Public Lands and Reservations, 36 Pub. Lands Dec. 567 (Dep't of Interior June 6, 1908). They required a company seeking to obtain the benefits of the Act to file field notes of a survey and a map, among other things, with the register of the land district in which the reservoir would be located. *Id.*, ¶¶ 8, 8(j), 10, 11. The field notes and map, the regulations said, "should" create a "record . . . so complete that from it the surveys could be accurately retraced by a competent surveyor with proper instruments." *Id.*, ¶ 10. The "line of survey" set forth in those documents, the regulations added, "should be . . . , as exactly as possible, the water line of the proposed reservoir." *Id.* The map had to be "strictly conformable to the field notes of the survey." *Id.*, ¶ 11. Once the Secretary approved the map, the "lines of [the reservoir], as laid down on the map," would be marked on township plats by local officials. *Id.*, ¶ 22. Following the construction of the reservoir, "[n]o new map" was required, "unless there [were] deviations from the right of way previously approved, either before or after construction," in which case "new maps and field notes in full" had to be filed. *Id.*, ¶ 23. Any new map had to "show clearly" or describe "the portions amended[,]" and the location had to be "described in the forms as the *amended* survey and the *amended* definite location." *Id.* (emphases added).

**B**

4

In the early 1900s, engineer Z.E. Sevison sought permission from the State of Wyoming to store water at the reservoir site. According to one of his applications, which the State ultimately approved, the dam at the site would rise eight feet above the water line when the reservoir was full. A map accompanying that application showed a high-water line at an elevation of 7,290 feet.[2]

In 1909, the Irrigation District's predecessor-in-interest submitted to the Department a map of the boundaries of a proposed Lake Hattie Reservoir for approval of a right-of-way under the Act. The project's chief engineer, W.H. Rosecrans, certified on the face of the map that the surveys of the reservoir and its canals "represent level lines, which are the proposed water lines of the reservoirs and the proposed grade lines of the canals, and that such surveys are accurately represented on the accompanying map and by the accompanying field notes." *See* Aplts.' App., Vol. I, at 119 (1909 Map). The map further certified that the surveys were "correctly represented on this map and by the accompanying field notes" as the "definite location" of the reservoir and canals. *See id.* Field

---

[2] As the district court noted, there is evidence in the record that this figure "is equivalent to" the 7,278 foot high-water elevation figure found in later documents and used more generally in this case and that "the discrepancy is likely due to [the use of] different elevation datum." Aplts.' App., Vol. I, at 83 n.3 (Findings of Fact & Conclusions of Law, filed Mar. 20, 2018); *cf. Miccosukee Tribe of Indians of Fla. v. United States*, 697 F. Supp. 2d 1324, 1341 n.25 (S.D. Fla. 2010) (observing that the "vertical control datum" established in 1929 was superseded by a new one in 1991 to account for, among other things, "crustal motion, and subsidence caused by withdrawal of underground fluid").

5

notes accompanying the map stated that, "[i]n running the line of the reservoir[,] the distances were determined by stadia on a self-reading rod divided into feet and tenths, which served at the same time as a level rod to determine the true water line." *Id.* at 105 (Field Notes). In 1911, the Department approved the map and the related application for a right-of-way under the Act.

A 1912 engineering report on the Lake Hattie project stated that the reservoir's high-water mark was 7,278 feet and that the dam rose to 7,285 feet. The district court found that those figures "have remained the same over time." *Id.* at 86 (Findings of Fact & Conclusions of Law, filed Mar. 20, 2018).

In 1923, the Irrigation District's predecessor-in-interest submitted to the Department two affidavits as proof of construction. The first, from an official of the predecessor-in-interest, stated that the reservoir had been constructed in conformity with the approved map and field notes and in full compliance with the Act. The second affidavit was from a civil engineer who had surveyed the reservoir and supervised its construction. The engineer stated:

> [T]hat the traverse of the shore line of [the reservoir] when filled to full capacity level is as given in the Field Notes accompanying [the application] . . . ; and that [the reservoir] as constructed conforms to the map and accompanying field notes . . . which were approved by the First Assistant Secretary of the Interior [in] 1911.

*Id*. at 128–29 (Bishop Aff., dated Nov. 7, 1923). Following the submission of those affidavits and other documents, the Department concluded that, with one

exception not now relevant, the reservoir had been "constructed and completed exactly in conformity with the specifications" and, thus, that "the easement [was] earned." *Id.* at 133–34 (Dep't of Interior Letter, dated Nov. 27, 1923).

In 1938, Congress passed the Small Tract Act, which authorized the Secretary to sell and lease small tracts of "vacant, unreserved, surveyed public land" for use as, *inter alia*, a home, cabin, or business site. *See* Act to Provide for the Purchase of Public Lands for Home and Other Sites, 52 Stat. 609 (1938). In 1949 and 1950, in apparent preparation for leasing land near the reservoir under the Small Tract Act, the Bureau of Land Management ("BLM") performed a re-survey of the reservoir and surrounding area.

In preparation for the re-survey, the BLM's Regional Chief of Engineering advised a local surveyor to "secure a copy of the traverse of the highwater line of Lake Hattie" and "copies of the field notes showing the bearings and distances along this right-of-way." Aplts.' App., Vol. I, at 136 (Bandy Letter, dated Sept. 28, 1949). The surveyor responded that he had located the 1909 map, which "seem[ed] to be the only relevant map . . . fixing the definite limit on the right of way granted for the reservoir." *Id.* at 137 (Naret Letter, dated Sept. 30, 1949). The surveyor further opined, however, that the map was of "doubtful value" because it omitted "numerous courses and distances describing the traverse of the

7

reservoir." *Id.* The surveyor also stated that he had not located the field notes, which he "consider[ed] essential." *Id.*

The BLM issued "Special Instructions" for performing the re-survey and ultimately dividing the land into tracts. The Special Instructions provided, *inter alia*, that surveyors should survey the boundaries of the reservoir right-of-way as described in the 1909 map and field notes. Surveyors were also instructed that a "boundary line" for tracts facing the reservoir should be kept at "approximately ten feet vertical height above the present water level, and should also be kept a minimum of forty feet from the right-of-way boundary." *Id.* at 140 (BLM Special Instructions, dated Oct. 6, 1949). This was intended to "leave a passage way at least forty feet in width between the right-of-way boundary and the lots, and to keep the lots above the high water elevation of the reservoir." *Id.*[3]

According to field notes from the re-survey, surveyors used the 1909 map as a reference point and may have located old surveyor's stakes remaining from

---

[3]      The Irrigation District suggests that some of the re-survey was performed either before the Special Instructions were issued or under a different set of Special Instructions in part because the reservoir plat from the re-survey indicates that it was completed under Special Instructions, "dated February . . . 1950." *See* Aplts.' App., Vol. I, at 157 (Reservoir Plat). The Landowners respond that any "incorrect date of the special instructions" in the re-survey work may be "a typographical error." Aplts.' Reply Br. at 19. Regardless, field notes from the re-survey discuss the process actually followed, and, as the Landowners observe, it is not significant to the issues before us "whether the surveyor was following instructions or [acting] of his own accord." *Id.* at 20.

the original survey. The plat ultimately resulting from the re-survey stated that it "represent[ed] a retracement and reestablishment of portions of the section boundaries and the high-water line of the reservoir, designed to restore the corners in their original locations, and the subdivision of a portion of the section." *Id.* at 157 (Reservoir Plat). There is testimony, however, that at the time of the re-survey portions of the "Rosecrans line" on the 1909 map were below the reservoir's water level and that the re-survey did not establish the reservoir's high-water line. *Id.* at 362, 455 (Trial Tr., dated Jan. 25, 2018); *see also id.* at 363 (testimony that, "[in] 1949, the level lines . . . as compared to [those in the 1909 map] were no longer at the same elevations"); *id.* at 380 (testimony that the "retracement" of "the [1909] line in 1949" was "independent of elevation"); Aplee.'s App., Vol. VI, at 1437 (Written Direct Test. of David R. Coffey) ("The 1949-50 BLM survey does not refer to the high-water line or the elevation of the spillway. Nor do the 1949-50 survey/survey field notes specify the elevation of the high water line. Nor does the 1949-50 survey attempt, in any way, to document the elevation of its retracement of the 1909 Rosecrans survey.").

In 1951, the Department issued a classification order under the Small Tract Act, declaring some land, much of which adjoined the reservoir, available for lease for cabins. Wyo. Classification Order No. 10, 16 Fed. Reg. 9288 (Sept. 13,

9

1951).  The order subdivided the land into fifty tracts identified during the BLM

re-survey.  *Id.*  The order also required lessees to make improvements to the land

"appropriate for the use for which the lease is issued."  *Id.* at 9289.  Federal

regulations later provided that land leased under the Small Tract Act could

sometimes be purchased, but only if the lessee had made the contemplated

improvements.  *See* 43 C.F.R. §§ 257.3(b), 257.13(a) (1954).

Between 1959 and 1963, the United States granted ownership patents to the

land at issue in this case to the Landowners' predecessors-in-interest.  The patents

were "subject to any vested and accrued water rights . . . and rights to ditches and

reservoirs used in connection with such water rights."  Aplts.' App., Vol. II, at

194–206 (Land Patents).  None of the patents specifically referenced the Lake

Hattie Reservoir or any right-of-way under the Act.  Several of the Landowners or

their predecessors-in-interest purchased title insurance policies for their land; the

policies, however, specifically excluded coverage for loss or damage resulting

from "instruments of record" relating to the Lake Hattie Reservoir.  *See* Aplee.'s

App., Vol. VI, at 1611 (Insurance Policy, dated July 7, 1999).

In 2016, during the course of this litigation, a surveyor retained by the

Landowners performed a bathymetric[4] survey of the reservoir "to determine the

---

[4]     *See generally Bathymetric*, WEBSTER'S THIRD NEW INTERNATIONAL
DICTIONARY (2002) (defining the term, *inter alia*, as "relating to the measurement
(continued...)

current elevation of the points indicated in the Rosecrans survey as it was retraced by the BLM." Aplts.' App., Vol. II, at 283 (Written Direct Test. of Jeffrey B. Jones, filed Jan. 10, 2018). The survey showed "twenty-four coincidental locations with elevations that are noted in the 1949 BLM Survey." *Id.* All of the locations were underwater at the time of the survey. A quarter of the locations were within one foot of the reservoir's water line as indicated on the 1909 map (i.e., an elevation of 7,258 feet), which the surveyor deemed "statistically significant." *Id.* The surveyor noted that these locations were predominately found in an area more sheltered from wind than other locations. The surveyor also observed that there were "several points" that had significantly different elevations than 7,258 feet, and that wind and water erosion and similar forces might have "significantly alter[ed] the landscape" in the intervening century. *Id.* at 283–84.

## C

The Landowners filed this action in district court seeking to quiet title to their land, eject the Irrigation District from it, and obtain damages for land unlawfully taken. They claimed that, since 2015, the Irrigation District had been storing water on their land "outside the limits" of its right-of-way under the Act

---

[4](...continued)
of depths of water in oceans, seas, or lakes").

and that it planned to continue to do so. Aplts.' App., Vol. I, at 37 (Compl., filed Apr. 28, 2016); *see also* Aplee.'s App., Vol. I, at 277–92 (First Am. Compl., filed Aug. 9, 2016) (raising the same claims). The Irrigation District answered and filed a counterclaim, principally for a declaratory judgment and to quiet title in its own favor.

The Landowners moved for summary judgment, arguing that the Irrigation District's right-of-way is defined solely by the 1909 map and that the right-of-way's boundaries on that map clearly did not overlap any of their properties. The Irrigation District opposed, arguing, *inter alia*, that its right-of-way is defined by the ground occupied by the water of its reservoir. In denying the Landowners' motion, the district court ruled that "the surveyed line shown on the 1909 map ultimately approved by the Department of the Interior is the 'marginal limits' of the ground occupied by the water of Lake Hattie Reservoir for purposes of determining the extent of [the] right-of-way." Aplts.' App., Vol. I, at 64 (Order Den. Pls.' Mot. for Summ. J., filed May 22, 2017). The district court concluded, however, that its ruling did not "end the matter" because there were "genuine issues of material fact as to where the 1909 line of survey . . . lie[s] in relation to the [Landowners'] properties." *Id.* at 64, 68.

The Landowners filed a second motion for summary judgment on similar grounds. The Irrigation District again opposed—and sought, in the same filing,

summary judgment in its own favor—reiterating its argument that its right-of-way is defined by the extent of its reservoir. It argued in part that the Landowners' theory "def[ied] logic," ignored the impact of erosion and similar forces, and would result in a right-of-way varying dramatically in elevation as the land shifts over time, whereas the water in its reservoir can exist "only [at] one elevation" at any given time because "[w]ater seeks its own level." Aplee.'s App., Vol. V, at 1302 (Opp'n to Pls.' Second Mot. for Summ. J., filed Aug. 7, 2017). The district court denied both motions on the ground that "genuine issues of material fact [still] exist[ed] as to where the 1909 line of survey . . . lies in relation to the [Landowners'] properties." Aplts.' App., Vol. I, at 77–78 (Order Den. Mots. for Summ. J., filed Oct. 5, 2017). The court opined that "the problem stems primarily from [the Landowners'] reliance on the 1950 BLM survey as an exact retracement of the 1909 survey line," even though "the field notes from the 1950 BLM survey create doubt as to its accuracy in actually retracing the 1909 line." *Id.* at 78.

After a bench trial, the district court issued findings of fact and conclusions of law, generally in favor of the Irrigation District. The district court discussed much of the background information described above and found that: (1) Mr. Rosecrans's reference to "level lines" showed that he had surveyed the reservoir at "a certain elevation level," *id.* at 85; (2) the field notes from the BLM re-survey did not indicate that it made any effort to determine the "actual

13

'right-of-way boundary' or the 'high water *elevation*' of the reservoir," *id.* at 90; (3) erosion had likely altered the features of the reservoir since its construction, and the 1909 map's "level line" was no longer level by the time the BLM attempted to retrace it, *id.*; (4) the "supposed boundary line," as retraced by both the BLM and the Landowners' expert, "varie[d] dramatically" in elevation, *id.* at 91; (5) Mr. Rosecrans intended his survey line to be level at some particular elevation, "as it must necessarily be in defining the scope of an easement for the storage of water," but the "line of the reservoir easement will necessarily move over time" due to erosion and similar forces, *id.*; (6) the only way to manage reservoir water is to control its elevation, as "[w]ater seeks its own level," *id.*; (7) the opinion of the Landowners' expert suggesting that the "water line . . . depicted on the 1909 Rosecrans survey is [at] 7,258 feet" is unreliable, as three-quarters of the survey points measured were not within one foot of that elevation and the expert did not adequately account for the effects of wind and wave action, *id.* at 92; (8) there was contemporaneous evidence that the 1909 map was "intended to depict" a high-water line eight feet below the crest of the dam, i.e., at 7,277 feet, *id.* at 92–93; and (9) since 2013, the Irrigation District has filled the reservoir only as high as 7,275 feet, *id.* at 93.

The district court then reviewed the law, concluding that "the extent and scope of a right-of-way granted under [the Act] is set and determined upon

14

approval of the required map" and, thus, "begins with the surveyed water line, as shown on the approved map." *Id.* at 94, 96. "Only in this way does the public have definite notice of the boundaries of the right-of-way for purposes of settlement." *Id.* at 96. The district court, therefore, rejected the Irrigation District's view that its right-of-way is defined by reference to the extent of its reservoir's water. *See id.* at 96–98. The district court nonetheless opined that given "the realities that a reservoir is, by definition, meant to store a certain capacity of water, and that Rosecrans intended to depict a level water line – necessarily at a certain elevation – the line depicted on the 1909 map is not a fixed, permanent line, but is instead a transitory line that has moved and will continue to move over time." *Id.* at 98. That is, "[b]ecause a reservoir can only be managed by controlling the level of the water contained therein, the scope and extent of [the Irrigation District's] right-of-way easement must be set at a certain elevation level." *Id.*

To determine that elevation level, the district court looked to "construction application documents" contemporaneous with the 1909 map, taking from them the height of the dam above the high-water line of the reservoir (i.e., eight feet).[5]

---

[5]     The district court did not specify which "construction application documents" it was relying on. Its findings of fact, however, mentioned this eight-foot figure in connection with Mr. Sevison's state-law, water-rights application. *See* Aplts.' App., Vol. I, at 83.

15

*Id.* at 98–99. The district court further observed that the elevation of the crest of the dam has consistently been 7,285 feet over time, and it would not be subject to erosion "in the same manner as the shoreline." *Id.* at 99. Thus, the Irrigation District's right-of-way was at an elevation of 7,277 feet, reflecting a distance of eight feet between "the intended high water line" and the elevation of the crest of the dam (i.e., 7,285 feet). *Id.* The district court accordingly quieted title in favor of the Irrigation District. Moreover, since the elevation of the water in the reservoir had not exceeded the extent of the right-of-way during the events giving rise to this lawsuit, the Landowners' damages claims were dismissed.

The district court entered judgment, and the Landowners timely appealed.

## II

### A

Where a district court makes findings of fact and draws conclusions of law following a bench trial, we review its findings of fact for clear error and its conclusions of law de novo. *See United States v. Estate of St. Clair*, 819 F.3d 1254, 1264 (10th Cir. 2016); *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1177–78 (10th Cir. 2000). "A finding is clearly erroneous when the reviewing court has a definite and firm conviction that it is mistaken, even though there may be some evidence to support it." *Estate of St. Clair*, 819 F.3d at 1264.

# B

## 1

The Landowners contend that the district court erroneously ruled that the boundary of the right-of-way was determinable by reference to something other than the approved map. *See* Aplts.' Opening Br. at 19–50. The Irrigation District makes a variety of responsive arguments, but it characterizes the "real issue" as follows: the purpose of a right-of-way under the Act is to permit the storage of water, which "seeks its own level," and, thus, the only way to manage reservoir water is by reference to the elevation of the water. Aplee.'s Resp. Br. at 38–40. As a result, resolving this case "necessarily required a ruling as to the *elevation* to which [the Irrigation District] . . . can store water." *Id.* at 16 (emphasis added). Having thoroughly considered the parties' arguments, we agree with the Landowners that the district court's ruling was premised on a legal error.[6]

Preliminarily, the Landowners emphasize that the Secretary's approval is necessary to give rise to any right-of-way under the Act. This is, for example, the primary thrust of the federal caselaw on which they rely. *See, e.g.*, *Utah Power & Light Co. v. United States*, 243 U.S. 389, 407 (1917) (ruling that defendants had not acquired a right-of-way under the Act in part because "no maps of location

---

[6] Because we agree with the Landowners on this issue and thus reverse and remand, we do not reach the Landowners' remaining assignments of error. *See* Aplts.' Opening Br. at 2 (listing those other issues).

ha[d] been filed or approved"); *Kern River Co. v. United States*, 257 U.S. 147, 151 (1921) ("The grant was to become effective when the [Secretary's] approval [of the map] was given; that is to say, the right of way was then to vest in the applicant for the purpose indicated in the act."); *see also Pine River Irrigation Dist. v. United States*, 656 F. Supp. 2d 1298, 1314 (D. Colo. 2009) (collecting cases for the proposition that, "[c]onsistent with this Supreme Court authority, virtually all reported federal and state case law, from 1899 to the present, construes [the Act] as requiring approval of the [Secretary] in order for a vested right of way to be obtained under the Act's provisions"). This line of authority is of limited relevance here, however, because the district court recognized that such approval was necessary. In fact, it purported to make the approved map the touchstone of its analysis and clearly rejected the Irrigation District's contrary argument that its right-of-way extended to "the lands occupied by the water of the reservoir." *See* Aplts.' App., Vol. I, at 96, 98.

Rather, the central problem with the district court's reasoning is its conclusion about what the Secretary actually approved. Specifically, the district court reasoned that because Mr. Rosecrans "intended to depict a level water line – necessarily at a certain elevation – the line depicted on the 1909 map is not a fixed, permanent line, but is *instead a transitory line that has moved and will continue to move over time*." *Id.* at 98 (emphasis added). To determine the

18

boundaries of the Irrigation District's right-of-way, the district court looked beyond the approved map and accompanying field notes to other evidence, ultimately divining the right-of-way's boundaries by extrapolating from the originally intended high-water elevation level and the height of the reservoir's dam. *Id.* at 98–99.

This portion of the district court's ruling was erroneous. The ruling was based principally on "the realities that a reservoir is, by definition, meant to store a certain capacity of water." *Id.* The relevant portions of the Act, however, which are expressly directed at issues attendant to water management, do not say that the lines on an approved map *will necessarily* respond to those realities by being transitory as to topography, but constant as to a certain elevation. *See* 26 Stat. at 1102. The relevant regulations do not mention this issue either—emphasizing instead how complete the field notes should be and that the map must be "strictly conformable" to them. *See* 36 Pub. Lands Dec. 567, ¶¶ 10, 11.

Turning from the general statutory and regulatory language to the approved map in this case, we similarly find little to no support for the district court's ruling. It is true that the map and its accompanying field notes *mentioned* the running of "level lines" in surveying the reservoir and drafting the map. That is, the face of the map certified that the surveys of the reservoir and its canals

"represent level lines, which are the proposed water lines of the reservoirs and the proposed grade lines of the canals," Aplts.' App., Vol. I, at 119, while the accompanying field notes stated that a "self-reading rod divided into feet and tenths . . . served . . . as a level rod to determine the true water line," *id.* at 105.

This hardly justifies, however, the conclusion that the line depicted on the map varies with topographical features *after approval* in order to maintain a constant elevation. At the very least, for the approved map to be so read, it would seem necessary for that map to include the relevant elevation figure. But the map at issue here does not. Instead, as the district court recognized, deducing that figure requires reference to other documents. In other words, our analysis might be different had Mr. Rosecrans submitted for approval a map and field notes listing an elevation figure, such that the Secretary's approval of the map of the right-of-way might fairly be read as incorporating that elevation figure. Here, however, the Secretary cannot be held to have approved an elevation figure that was not directly presented to him.

Authorities considering the purposes of the approved-map requirement cast the district court's conclusion further into doubt. For example, according to an 1894 Department of the Interior circular, one of the Department's "dut[ies]" in reviewing applications under the Act was to ascertain whether the "proposed works [were] described in such a manner that the benefits to be granted by the

approval of the Secretary [were] defined so as to avoid future uncertainty." U.S.

Dep't of Interior, Circular, Right of Way—Canals, Ditches and Reservoirs, 18

Pub. Lands Dec. 168, ¶ 28 (Feb. 20, 1894).

Similarly, in an administrative decision, an official in the Department's

General Land Office considered an application under the Act where the map gave

a different figure for the width of a canal than was given in other application

paperwork. *See The Pecos Irrigation & Improvement Co.*, 15 Pub. Lands Dec.

470, 470–71 (Dep't of Interior Nov. 19, 1892).[7] According to the official,

although it was "immaterial" which measurement was correct, it was nonetheless

"important that the width be stated definitely and certainly before approval." *Id.*

at 471. The official also observed that, in some places, the shore line of a canal

was not surveyed, but was apparently drawn on the map using "mere estimates."

*Id.* at 472. The official continued:

> I am called upon to say that the object and purpose of the law in
> requiring a map of a canal to be filed, that its lines may be noted
> on the tract-book and records of the land office was that such
> map should accurately and definitely show the lines of the canal
> that they should be so marked and noted that a competent
> surveyor with proper instruments could go upon the ground and
> retrace the boundary line between the canal and the land of any

---

[7] "[D]ecisions of the Land Department on matters of law are not binding upon this court, in any sense. But on questions similar to the one involved in this case [i.e., the interpretation of a particular land grant statute] they are entitled to great respect at the hands of any court." *Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357, 366 (1889).

adjoining proprietor.

> The statute gives to the company not only the right to construct a canal across the public lands, but it gives them a perpetual easement for canal purposes in fifty feet on each side of such canal, the meander line being fifty feet from the high water line. *If there is nothing to determine this line but the flow of water, the rise and fall, the seasons of drought and rainfall will be productive of litigation vexatious and interminable*.

*Id.* (emphasis added).

*Pecos Irrigation and Improvement* also stated, however, that the map before the Department would "furnish no accurate or reliable information to the officers of the government, or to persons who might examine it with a view to making settlement on the tract encumbered by this easement." *Id.* at 472–73. Therefore, the official ultimately returned the map without approval, further stating that he had the duty to "see that the lines are so fixed and determined that the patentee may know what he is receiving of the government when he takes its patent for the land over which this canal is constructed." *Id.* at 473; *see also Windsor Reservoir & Canal Co. v. Miller*, 51 Pub. Lands Dec. 27, 33 (Dep't of Interior Jan. 10, 1925) ("The extent of the ground occupied by the water of a reservoir, for which a right of way has been granted under [the Act], must be determined from the high-water line, *as shown by the approved map*. The approval of the map by the Department is an adjudication that the whole area shown to be within the high-water line of the reservoir is necessary for the construction, maintenance,

22

and care of such reservoir." (emphasis added)).

These authorities make clear that among the central purposes of the Act's approved-map requirement are giving notice of the boundaries of the right-of-way under the Act, promoting certainty regarding such boundaries to permit planning for orderly development of adjacent properties, and preventing unnecessary litigation. While the district court cited these authorities for similar propositions, its ultimate ruling untethered the Act's approved-map requirement from those rationales. The detailed platting at a particular moment of a "transitory line that has moved and will continue to move over time," Aplts.' App., Vol. I, at 98, is of little use for planning and notice-giving purposes. *See also* Aplts.' Supp. App. at 9 (Hr'g. Tr., dated June 23, 2016) (the district court questioning the purpose "of getting a survey and putting it on a plat and correlating it to the land records if that isn't going to control," and observing that *not* allowing it to control would be "nonsensical and useless, because [allowing the plat to control] provides future owners and purchasers the ability to know what the easement, the right-of-way is"). It is clear, moreover, that the Secretary here approved of a line fixed to the original topography because the map does not in any way indicate that the line is transitory, and the factor that allegedly determines the line's varying location (i.e., water elevation) is not expressed on the map and requires reference to other documents to ascertain.

We also find support for the Landowners' position, albeit by analogy, in *City and County of Denver v. Bergland*, 695 F.2d 465 (10th Cir. 1982). There, interpreting a different statutory scheme, we held that construction work deviating from a right-of-way "shown on the original map application" was "not authorized by the original grant." *Id.* at 480. Notably, we rejected Denver's argument that its construction along a new "alignment" was acceptable because it was consistent with a "gravity flow concept" and followed "almost a parallel alignment," ruling that "the right of way was not granted in recognition of a concept." *Id.* Instead, Denver was granted a right-of-way for a "specific area" based on a map and field notes that (as here) were required to be so complete that from them the surveys could be "accurately retraced by a competent surveyor with proper instruments." *Id.* We said that "[i]t was rational for the [Department] to require [such] accuracy so that it and the [United States Forest Service] could plan properly," and, "[i]f problems were encountered in actual construction, the [Department] provided a procedure for amending the application." *Id.* We, thus, held that Denver had exceeded the scope of its original grant, which was "still valid, and, but for the fact that it would be technologically difficult and economically infeasible, could still be utilized by Denver." *Id.*

Here, as in *Bergland*, the Department defined the Irrigation District's rights by reference to an approved map depicting a specific geographic area;

24

consequently, other factors that arguably could be advanced as bearing on the scope of its rights—whether elevation or the practical infeasibility of using the right-of-way actually depicted on the map—are irrelevant. *But cf.* Aplee.'s Resp. Br. at 6 ("For [the Irrigation District] to utilize its water rights for Lake Hattie, it must be able to fill to the spillway elevation of 7278 feet.").[8]

Therefore, in the salient light of the statutory and regulatory text, the contents of the map (and field notes) that the Secretary actually approved in this case, the purposes of the approved-map requirement, and our analysis in *Bergland*, the district court erred in considering water elevation as *the* defining feature of the right-of-way in this case and in looking beyond the approved map to determine that elevation.

**2**

The Irrigation District makes other arguments for affirmance, none of which we find availing. It argues that the BLM was required to follow Wyoming

---

[8] The Irrigation District cites *Bergland* for the proposition that if there is a "deviation of a facility from its course, [the] deviation 'is a problem of administration, within the **sole jurisdiction** of the [Department of] Interior.'" Aplee.'s Resp. Br. at 20 (quoting *Bergland*, 695 F.2d at 480). This portion of *Bergland* addressed the relative regulatory roles of two federal agencies—the United States Forest Service (a part of the Department of Agriculture) and the Department of the Interior—with respect to the construction at issue there. *See* 695 F.2d at 480–81. This discussion is not apposite here. And, tellingly in this regard, the Irrigation District makes no actual argument that this proposition from *Bergland* applies to these facts.

25

law in conducting the re-survey and, had it done so, it would have recognized that it "needed to define the [Act] easement by the high-water line elevation" and "the parties would not be in this [c]ourt today." Aplee.'s Resp. Br. at 25; *see also Johnson Irrigation Co. v. Ivory*, 24 P.2d 1053, 1057 (Wyo. 1933) (concluding that the line shown on maps approved under the Act was a "meander line intended to coincide with the natural ground shore," and "[i]t is generally held in such cases that the body of water itself, and not the surveyed meander line, is the true boundary"). And, more generally, the Irrigation District reiterates the position it took in district court, i.e., that *Johnson* and other authorities counsel that a right-of-way under the Act is defined by the extent of the reservoir's water. *See, e.g.*, *Grand View Seepage Reservoirs & Ditches*, 43 Pub. Lands Dec. 317, 320 (Dep't of Interior May 29, 1914) (quoting the Act and stating that, "[n]ecessarily, the high water line of water having a natural ground shore must be taken as the marginal limit of such water").

As the Irrigation District observes, however, the district court's ruling was not premised on any of those rationales. *See* Aplee.'s Resp. Br. at 25–26. Indeed, although the district court found that the record concerning the BLM re-survey "create[d] doubt" as to its accuracy in retracing the line on the 1909 map, Aplts.' App. at 89, the district court did not discuss the BLM re-survey or its alleged defects in reaching its ultimate conclusions. Moreover, the district court

expressly *rejected* the Irrigation District's argument that its right-of-way is defined by the extent of its reservoir's water. At oral argument, the Irrigation District acknowledged that the district court had adopted "the [Landowners'] own theory," supplemented with high-water elevation information, rather than the Irrigation District's "alternative theory." Oral Arg. 32:38–32:54.

Of course, we can affirm on alternate grounds if the record is adequately developed. *See, e.g.*, *United States v. Gaines*, 918 F.3d 793, 800 (10th Cir. 2019). We find, however, the Irrigation District's arguments unconvincing. We first turn to its state-law argument based on *Johnson*. *See* Aplee.'s Resp. Br. at 25. We briefly review the facts of that case before explaining our reasoning.

In *Johnson*, an irrigation company had a right-of-way under the Act, and lands covered by its reservoir on the right-of-way had been granted to the defendants subject to the right-of-way. 24 P.2d at 1053–54. The dispute in that case concerned the right to use, for agricultural purposes, certain lands within the "surveyed marginal line" on the approved maps. *Id.* at 1054.

In analyzing the scope of the right-of-way, and particularly whether the approved maps delineated the irrigation company's rights, the Wyoming Supreme Court stated that the line of the reservoir "on the approved maps is a meander line intended to coincide with the natural ground shore, and not different from the meander line of a natural lake." *Id.* at 1057. The court observed that "[i]t is

27

generally held in such cases that the body of water itself, and not the surveyed meander line, is the true boundary," and that, "[i]n the eye of the law[,] the shore of a body of water, though a shifting line, is just as fixed a boundary as a street or wall." *Id. Johnson* concluded that the Secretary's approval of maps "showing a meander line as the north boundary of plaintiff's right of way had the legal effect of a declaration that the boundary between the land granted . . . to plaintiff and the land retained and thereafter granted . . . to defendants is the shore of the reservoir, and not the meander line shown on the maps." *Id.* at 1058. That ruling purported to "insure[] to plaintiff the right of way Congress intended to grant, while permitting defendants to enjoy their lands 'subject to such right of way.'" *Id.*

*Johnson* is of little assistance to the Irrigation District, however, because the central issue here did not arise in *Johnson*, where the disputed land was *within* "the surveyed marginal line as shown on plaintiff's maps filed and approved under [the Act]." *Id.* at 1054; *see id.* at 1055, 1058 (stating that "[p]laintiff's right is shown by the approved maps" and that plaintiff had the right to "all the land bounded by the platted meander line of its reservoir"). *Johnson* did not consider what is at issue here: whether a right-of-way under the Act may extend *beyond* the platted line if the reservoir's high-water elevation so dictates.

Moreover, contrary to the Irrigation District's contention that the BLM was

28

required to adhere to Wyoming law in conducting the re-survey, there is no suggestion that state law is controlling here. Notwithstanding general statements in cases like *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977) that property rights, including water rights, are defined by state law, *see id.* at 377–79, the issue presented in this case, i.e., the scope of a right-of-way created entirely by federal law, is definitionally a question of federal law. *See United States v. Oregon*, 295 U.S. 1, 27–28 (1935) (stating that the interpretation of federal land grants is a federal question that involves the consideration of state law "only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances").

Our decision in *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006), is informative here. That case concerned "the legal status of claims by local governments to rights of way for the construction of highways across federal lands managed by the [BLM]," and the "central question" was how rights under the Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (commonly called "R.S. 2477")—an "open-ended grant" of rights-of-way for constructing highways over public land—were acquired. *S. Utah Wilderness All.*, 425 F.3d at 740, 758. We concluded "that federal law governs the interpretation of R.S. 2477, but that in

29

determining what is required for acceptance of a right of way under the statute, federal law 'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *Id.* at 768.

The Irrigation District advances *Southern Utah Wilderness Alliance* in support of incorporating state-law principles here. That case, however, actually militates against that result because we borrowed state-law principles there only in light of the specific history and structure of R.S. 2477. *Id.* at 761–68. Indeed, we reiterated the rule of *Oregon*, mentioned above, that courts may use state law to interpret federal land grant statutes "only in so far as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to [it]." *Id.* at 762–63 (quoting *Oregon*, 295 U.S. at 28). Here, by contrast, the Irrigation District directs us only to language in the Act that rights-of-way under the Act "shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective States or Territories," 26 Stat. at 1102, and a 1947 BLM survey manual stating that surveyors should "conform" their defining of partition lines in the beds of non-navigable streams to state law and "stud[y]" the laws and court decisions of states where they perform their work "in order to determine the procedure required to protect the rights of the riparian owners," Aplee.'s App., Vol. VIII, at 2020 (Surveying Manual, dated

30

Aug. 5, 1947). Those two statements fall far short of showing that the United States has impliedly adopted and assented to any state-law principles set forth in *Johnson*.

Finally, for essentially the same reasons cited by the district court, we also reject the Irrigation District's argument that its right-of-way is defined simply by the extent of its reservoir's water. *See* Aplts.' App., Vol. I, at 96–98. Although the Irrigation District is correct that the Act states that its right-of-way extends to the "ground occupied by the water of the reservoir," the Act also provides that the right of way will be subject to the government's approval of a "map[] of location" of that reservoir, *see* 26 Stat. at 1101–02—with the centrality of that government approval being further bolstered by subsequent regulations.

Moreover, because the administrative decisions on which the Irrigation District relies do not directly support its position, it is compelled to rely on—at most—tangentially relevant *dicta* from those cases. *See, e.g.*, *Boughner v. Magenheimer*, 42 Pub. Lands Dec. 595, 598 (Dep't of Interior Aug. 29, 1913) ("[The Act] does not require the entire system to be surveyed, mapped, and applied for *at the same time*. Section 19 thereof specifically authorizes the filing in sections of 10 miles each, within 12 months after the date of completing survey of each section." (emphasis added)). *Compare Grand View Seepage*, 43 Pub. Lands Dec. at 320 (stating that "the high water line of water having a natural

31

ground shore must be taken as the marginal limit of such water"), *with* Aplts.' App., Vol. I, at 96 (the district court observing that the Department in *Grand View Seepage* "was making a distinction between the marginal limits of water having a natural ground shore and the marginal limits where the water is confined by a dam, as opposed to a difference between the surveyed line on the approved map and the high-water line elevation or spillway of the reservoir").

In light of the authority we discussed previously concerning the importance of the approved-map requirement and the purposes served by it, we decline the Irrigation District's invitation to affirm on the ground that its right-of-way is defined simply by the extent of its reservoir's water.

\*\*\*

In sum, the statutory and regulatory framework before us requires that the Irrigation District's right-of-way under the Act be determined by reference to the approved map. It may well be, as the district court reasoned, that this map tacitly contemplated a right-of-way defined by reference to a particular high-water elevation level at the time it was drafted. But such an elevation level is nowhere to be found on the map that the Secretary approved. Under these circumstances, neither the relevant legal authorities, nor the purposes of the approved-map requirement, would countenance a ruling that held that the scope of the right-of-way here is to be defined by such an elevation level. Thus, the district court erred

in holding that "[b]ecause a reservoir can only be managed by controlling the level of the water contained therein, the scope and extent of [the] right-of-way easement must be set at a certain elevation level." *See* Aplts.' App., Vol. I, at 98. The Irrigation District's arguments to the contrary—which embrace, on the one hand, the district court's rationale and offer, on the other, alternate grounds for affirmance—are unavailing.

## III

In light of the foregoing, we **REVERSE** and **REMAND** for additional proceedings consistent with this order and judgment.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

33